ORIGINAL

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS

| | |
|---|---|
| Patent Compliance Group, Inc., Relator, | |
| v. | JURY TRIAL DEMANDED |
| Activision Publishing, Inc., Defendant. | Case No. _____ 3-10CV0288-B |

## COMPLAINT FOR FALSE MARKING

*Qui tam* relator Patent Compliance Group, Inc. ("Patent Compliance Group"), for its Complaint against Defendant Activision Publishing, Inc. ("Defendant"), alleges, based on its own personal knowledge with respect to its own actions and based upon information and belief with respect to all others' actions, as follows:

### BACKGROUND

1. This is an action for false patent marking under Title 35, Section 292, of the United States Code.

2. Defendant has violated 35 U.S.C. § 292(a) by marking unpatented articles with the purpose of deceiving the public. More specifically, Defendant has, with the purpose of deceiving the public:

   (i) marked products with patents having a scope which does not cover the marked products;

   (ii) marked products with language indicating that the products are the subject of pending patent applications when no relevant application is pending; and/or

  (iii) used in advertising in connection with unpatented products the word "patent" and/or any word or number importing that the product is patented.

3. The marking and false marking statutes exist to give the public notice of patent rights. Congress intended the public to rely on marking as a ready means of discerning the status of intellectual property embodied in an article of manufacture or design. Federal patent policy recognizes an important public interest in permitting full and free competition in the use of ideas which are, in reality, a part of the public domain.

4. False patent marking is a serious problem. Acts of false marking deter innovation and stifle competition in the marketplace. If an article that is within the public domain is falsely marked, potential competitors may be dissuaded from entering the same market. False marks may also deter scientific research when an inventor sees a mark and decides to forego continued research to avoid possible infringement. False marking can cause unnecessary investment in design around or costs incurred to analyze the validity or enforceability of a patent whose number has been marked upon a product with which a competitor would like to compete. Furthermore, false marking misleads the public into believing that a patentee controls the article in question (as well as like articles), externalizes the risk of error in the determination, placing it on the public rather than the manufacturer or seller of the article, and increases the cost to the public of ascertaining whether a patentee in fact controls the intellectual property embodied in an article. In each instance where it is represented that an article is patented, a member of the public desiring to participate in the market for the marked article must incur the cost of determining whether the involved patents are valid and enforceable. Failure to take on the costs of a reasonably competent search for information necessary to interpret each patent, investigation into prior art and other information bearing on the quality of the patents, and analysis thereof can

result in a finding of willful infringement, which may treble the damages an infringer would otherwise have to pay. False markings may also create a misleading impression that the falsely marked product is technologically superior to previously available ones, as articles bearing the term "patent" may be presumed to be novel, useful, and innovative.

5. The false marking statute explicitly permits *qui tam* actions. By permitting members of the public to sue on behalf of the government, Congress allowed individuals to help control false marking.

6. Patent Compliance Group, on its own behalf and on behalf of the United States, seeks an award of monetary damages of not more than $500 for each of Defendant's violations of 35 U.S.C. § 292(a), one-half of which shall be paid to the United States pursuant to 35 U.S.C. § 292(b).

### THE PARTIES

7. Patent Compliance Group is a Texas corporation with its principal place of business at 4223 Buena Vista Street, Suite 4.

8. Patent Compliance Group exists to conduct all lawful business, including but not limited to enforcing the false marking statute.

9. Patent Compliance Group represents the United States and the public, including Defendant's existing and future competitors.

10. Defendant is a Delaware corporation with its principal place of business at 3100 Ocean Park Boulevard, Santa Monica, California, 90405.

11. Defendant regularly conducts and transacts business in Texas, throughout the United States, and within the Northern District of Texas, itself and/or through one or more subsidiaries, affiliates, business divisions, or business units. Defendant has not designated or

maintained a resident agent for service of process although Defendant is required to do so by statute and/or engages in business in Texas. Therefore, the Secretary of State is an agent for service of process on Defendant.

### JURISDICTION AND VENUE

12. This Court has exclusive jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1338(a).

13. This Court has personal jurisdiction over Defendant. Defendant has conducted and does conduct business within the State of Texas. Defendant, directly or through subsidiaries or intermediaries, offers for sale, sells, marks and/or advertises the products that are the subject of this Complaint in the United States, the State of Texas, and the Northern District of Texas.

14. Defendant has voluntarily sold the products that are the subject of this Complaint in this District, either directly to customers in this District or through intermediaries with the expectation that the products will be sold and distributed to customers in this District. These products have been and continue to be purchased and used by consumers in the Northern District of Texas. Defendant has committed acts of false marking within the State of Texas and, more particularly, within the Northern District of Texas.

15. Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b)-(c) and 1395(a), because (i) Defendant's products that are the subject matter of this cause of action are advertised, marked, offered for sale, and/or sold in various retail stores and/or on the Internet in this District; (ii) a substantial part of the events or omissions giving rise to the claim occurred in this District; and (iii) Defendant is subject to personal jurisdiction in this District, as described above.

16. Patent Compliance Group brings this action under 35 U.S.C. § 292(b), which provides that any person may sue for civil monetary penalties for false patent marking.

## FACTS

17. Patent Compliance Group incorporates by reference the foregoing paragraphs as if fully set forth herein.

18. Defendant is a large, sophisticated company with approximately 7,000 employees.

19. Defendant has, or regularly retains, sophisticated legal counsel.

20. Defendant has decades of experience applying for patents, obtaining patents, licensing patents, and/or litigating in patent infringement lawsuits.

21. Defendant knows that a patent does not cover any product that is not within the scope of its claims.

22. Each false marking on the products identified in this Complaint is likely to, or at least has the potential to, discourage or deter persons and companies from commercializing competing products.

23. Defendant's false marking of its products has wrongfully quelled competition with respect to such products thereby causing harm to Patent Compliance Group, the United States, and the public.

24. Defendant has wrongfully and illegally advertised patent monopolies which it does not possess and, as a result, has benefited by maintaining a substantial market share with respect to the products referenced in this Complaint.

25. United States Patent No. 5,739,457 (the "'457 patent"), titled *Method and Apparatus for Simulating a Jam Session and Instructing a User How to Play the Drums*, was issued by the United States Patent and Trademark Office on August 14, 1998. (*See* Ex. A.) The '457 patent only covers or protects, by way of patent property right, (i) an apparatus that comprises, *inter alia*, a money validation unit to accept and validate a user's money and a video

display system and a control system for receiving an input from the money validation unit; (ii) a method that performs, *inter alia*, the steps of determining that a predetermined amount of money has been inserted into a money validation unit and activating a plurality of electronic drum pads, a lighting system, an audio speaker system a video display system upon determining that the predetermined amount of money; (iii) an apparatus that comprises, *inter alia*, a video display system and a video display system; or (iv) an audio-visual interactive arcade apparatus that comprises, *inter alia*, a cabinet having an entrance and an audio speaker system and a video display system (collectively, the "Scope of the '457").

26.     Despite the fact that the claims of the '457 patent cover only the Scope of the '457, Defendant marked (or caused to be marked) the following products that are clearly out of the scope of the '457 patent: (i) DJ Hero (for all video game consoles) (ii) Guitar Hero 5 (for all video game consoles); (iii) Band Hero (for all video game consoles); and (iv) Guitar Hero Smash Hits (for all consoles) (the "Out of Scope '457 Products"). (*See* Ex. K through S.)  While the actual scope of the '457 patent is governed (and the Scope of the '457 is further narrowed) by the complete set of claim limitations, the limitations that are listed as the Scope of the '457 patent demonstrate that the Out of Scope '457 Products clearly do not practice the '457 patent.

27.     Defendant knew that the '457 patent does not cover the Out of Scope '457 Products.

28.     Alternatively, because the '457 patent unmistakably does not cover the Out of Scope '457 Products, Defendant cannot have any reasonable belief that the Out of Scope '457 Products are patented or covered by the '457 patent.

29.     Defendant intended to deceive the public by marking (or causing to be marked) the Out of Scope '457 Products with the '457 patent.

30.     United States Patent No. 6,018,121 (the "'121 patent"), titled *Method and Apparatus for Simulating a Jam Session and Instructing a User How to Play the Drums*, was issued by the United States Patent and Trademark Office on January 25, 2000. (*See* Ex. B.) The '121 patent only covers or protects, by way of patent property right, (i) an audio-visual interactive drum apparatus that comprises, *inter alia*, a money validation unit to accept and validate a user's money and a control system for receiving an input from the money validation unit; for receiving inputs from the electronic drum pads; and for controllably driving the audio source to provide user feedback once the user has inserted a predetermined amount of money into the money validation unit; (ii) an audio-visual interactive drum play method that comprises, *inter alia*, the steps of determining that a predetermined amount of money has been inserted into a money validation unit and activating a plurality of electronic drum pads, and an audio source upon recognition of the insertion of the predetermined amount of money; (iii) an audio-visual interactive music game comprising, *inter alia*, an audio speaker system and a video display system; (iv) an interactive musical arcade apparatus comprising, *inter alia*, a cabinet having an entrance and a small footprint suitable for use in an arcade environment; or (v) an interactive musical arcade game apparatus that comprises, *inter alia*, a cabinet having an entrance (collectively, the "Scope of the '121").

31.     Despite the fact that the claims of the '121 patent cover only the Scope of the '121, Defendant marked (or caused to be marked) the following products that are clearly out of the scope of the '121 patent: (i) DJ Hero (for all video game consoles); (ii) Guitar Hero 5 (for all video game consoles); (iii) Band Hero (for all video game consoles); and (iv) Guitar Hero Smash Hits (for all consoles) (the "Out of Scope '121 Products"). (*See* Ex. K through S.) While the actual scope of the '121 patent is governed (and the Scope of the '121 is further narrowed) by the

complete set of claim limitations, the limitations that are listed as the Scope of the '121 patent demonstrate that the Out of Scope '121 Products clearly do not practice the '121 patent.

32. Defendant knew that the '121 patent does not cover the Out of Scope '121 Products.

33. Alternatively, because the '121 patent unmistakably does not cover the Out of Scope '121 Products, Defendant cannot have any reasonable belief that the Out of Scope '121 Products are patented or covered by the '121 patent.

34. Defendant intended to deceive the public by marking (or causing to be marked) the Out of Scope '121 Products with the '121 patent.

35. United States Patent No. 6,252,153 (the "'153 patent"), titled *Song Accompaniment System*, was issued by the United States Patent and Trademark Office on June 26, 2001. (*See* Ex. C.) The '153 patent only covers or protects, by way of patent property right, a song accompaniment system comprising, *inter alia*, a singing support apparatus including a first sound output device which outputs accompanying music played by a plurality of musical instruments with a capability to mix and output vocal sounds entered from a microphone with the accompanying music; and an instrumental accompaniment apparatus including a simulative instrument having a timing indicating operation device, a first monitor which presents on-screen guidance indicating operating timing of the simulative instrument for playing a simulative instrument part of the accompanying music selectively taken in from the singing support apparatus, and a second sound output device which outputs sounds of the simulative instrument part when the instrumental accompaniment apparatus senses that the timing indicating operation device is operated in accordance with the on-screen guidance; wherein the singing support apparatus stores the simulative instrument part of the accompanying music and remaining part of

the accompanying music, and delivers the accompanying music excluding the simulative instrument part to the first sound output device (the "Scope of the '153").

36.  Despite the fact that the claims of the '153 patent cover only the Scope of the '153, Defendant marked (or caused to be marked) the following products that are clearly out of the scope of the '153 patent: (i) Guitar Hero 5 (for all video game consoles); (ii) Band Hero (for all video game consoles); and (iii) Guitar Hero Smash Hits (for all consoles) (the "Out of Scope '153 Products"). (*See* Ex. L through S.) While the actual scope of the '153 patent is governed (and the Scope of the '153 is further narrowed) by the complete set of claim limitations, the limitations that are listed as the Scope of the '153 patent demonstrate that the Out of Scope '153 Products clearly do not practice the '153 patent.

37.  Defendant knew that the '153 patent does not cover the Out of Scope '153 Products.

38.  Alternatively, because the '153 patent unmistakably does not cover the Out of Scope '153 Products, Defendant cannot have any reasonable belief that the Out of Scope '153 Products are patented or covered by the '153 patent.

39.  Defendant intended to deceive the public by marking (or causing to be marked) the Out of Scope '153 Products with the '153 patent.

40.  United States Patent No. 6,268,557 (the "'557 patent"), titled *Methods and Apparatus for Providing an Interactive Musical Game,* was issued by the United States Patent and Trademark Office on July 31, 2001. (*See* Ex. D.) The '557 patent only covers or protects, by way of patent property right, an interactive music game apparatus comprising, *inter alia*, a money operated mechanism for insertion of a predetermined amount of money to commence play of a music game; a plurality of speakers for providing musical output during play of the

music game; a display to provide indicia to guide play of the music game; and a cabinet for mounting the money operated mechanism, the plurality of speakers, and the display (the "Scope of the '557").

41. Despite the fact that the claims of the '557 patent cover only the Scope of the '557, Defendant marked (or caused to be marked) the following products that are clearly out of the scope of the '557 patent: (i) Guitar Hero 5 (for all video game consoles); (ii) Band Hero (for all video game consoles); and (iii) Guitar Hero Smash Hits (for all consoles) (the "Out of Scope '557 Products"). (*See* Ex. L through S.) While the actual scope of the '557 patent is governed (and the Scope of the '557 is further narrowed) by the complete set of claim limitations, the limitations that are listed as the Scope of the '557 patent demonstrate that the Out of Scope '557 Products clearly do not practice the '557 patent.

42. Defendant knew that the '557 patent does not cover the Out of Scope '557 Products.

43. Alternatively, because the '557 patent unmistakably does not cover the Out of Scope '557 Products, Defendant cannot have any reasonable belief that the Out of Scope '557 Products are patented or covered by the '557 patent.

44. Defendant intended to deceive the public by marking (or causing to be marked) the Out of Scope '557 Products with the '557 patent.

45. United States Patent No. 6,369,313 (the "'313 patent"), titled *Method and Apparatus for Simulating a Jam Session and Instructing a User How to Play the Drums*, was issued by the United States Patent and Trademark Office on April 9, 2002. (*See* Ex. E.) The '313 patent only covers or protects, by way of patent property right, (i) an audio-visual interactive drum apparatus that comprises, *inter alia*, a money validation unit to accept and validate a user's

money and a control system for receiving an input from the money validation unit; for receiving inputs from the electronic drum pads; and for controllably driving the lighting system, the audio speaker system and the video display system; (ii) an audio-visual interactive drum play method that comprises, *inter alia*, the steps of inserting a predetermined amount of money into a money validation unit and activating a plurality of electronic drum pads, a lighting system, an audio speaker system and a video display system upon recognition of the insertion of the predetermined amount of money; (iii) an audio-visual interactive music apparatus that comprises, *inter alia*, an audio speaker system and a video display system; or (iv) an audio-visual interactive arcade apparatus that comprises, *inter alia*, a cabinet having an entrance and a suitably small footprint and an audio speaker system and a video display system (collectively, the "Scope of the '313").

46. Despite the fact that the claims of the '313 patent cover only the Scope of the '313, Defendant marked (or caused to be marked) the following products that are clearly out of the scope of the '313 patent: (i) DJ Hero (for all video game consoles); (ii) Guitar Hero 5 (for all video game consoles); (iii) Band Hero (for all video game consoles); and (iv) Guitar Hero Smash Hits (for all consoles) (the "Out of Scope '313 Products"). (*See* Ex. K through S.) While the actual scope of the '313 patent is governed (and the Scope of the '313 is further narrowed) by the complete set of claim limitations, the limitations that are listed as the Scope of the '313 patent demonstrate that the Out of Scope '313 Products clearly do not practice the '313 patent.

47. Defendant knew that the '313 patent does not cover the Out of Scope '313 Products.

48.     Alternatively, because the '313 patent unmistakably does not cover the Out of Scope '313 Products, Defendant cannot have any reasonable belief that the Out of Scope '313 Products are patented or covered by the '313 patent.

49.     Defendant intended to deceive the public by marking (or causing to be marked) the Out of Scope '313 Products with the '313 patent.

50.     United States Patent No. 6,379,244 (the "'244 patent"), titled *Music Action Game Machine, Performance Operation Instructing System for Music Action Game and Storage Device Readable by Computer*, was issued by the United States Patent and Trademark Office on April 30, 2002. (*See* Ex. F.) The '244 patent only covers or protects, by way of patent property right, (i) a music action game machine comprising, *inter alia*, a music play device for playing the musical composition based on the data stored in the storage device and an operation instructing device for giving the player a visual instruction to operate the operation members in accordance with progress of a play of the musical composition based on the data stored in the storage device and an effect producing device for producing a performance effect in response to a performance operation performed by the player to each of the operation members; (ii) a music action game machine comprising, *inter alia*, a main body and a music play device for playing the musical composition based on the data stored in the storage device and an operation instructing device for giving the player a visual instruction to operate the operation members in accordance with progress of a play of the musical composition based on the data stored in the storage device and an effect producing device for producing a performance effect in response to a performance operation performed by the player to each of the operation members; (iii) a music action game machine comprising, *inter alia*, a main body and a music play device for playing the musical composition based on the data stored in the storage device and an operation instructing device

for giving the player a visual instruction to operated the operation members in accordance with progress of a play of the musical composition based on the data stored in the storage device and an effect producing device for producing a performance effect in response to a performance operation performed by the player to each of the operation members; (iv) a music action game machine comprising, *inter alia*, a main body and a music play device for playing the musical composition based on the data stored in the storage device and an operation instructing device for giving the player a visual instruction to operate the operation members in accordance with progress of a play of the musical composition based on the data stored in the storage device and an effect producing device for producing a performance effect in response to a performance operation performed by the player to each of the operation members; (v) music action game machine comprising, *inter alia*, a main body and a music play device for playing the musical composition based on the data stored in the storage device and an operation instructing device for giving the player a visual instruction to operate the operation members in accordance with progress of a play of the musical composition based on the data stored in the storage device and an effect producing device for producing a performance effect in response to a performance operation performed by the player to each of the operation members; (vi) a music action game machine comprising, *inter alia*, a music play device for playing the musical composition based on the data stored in the storage device and an operation instructing device for giving the player a visual instruction to operate the operation members in accordance with progress of a play of the musical composition based on the data stored in the storage device and an effect producing device for producing a performance effect in response to a performance operation performed by the player to each of the operation members; (vii) a music action game machine comprising, inter alia, a music play device for playing the musical composition based on the data stored in the

storage device and an operation instructing device for giving the player a visual instruction to operate the operation members in accordance with progress of a play of the musical composition based on the data stored in the storage device and an effect producing device for producing a performance effect in response to a performance operation performed by the player to each of the operation members; or (viii) a music action game machine comprising, inter alia, a music play device for playing the musical composition based on the data stored in the storage device and an operation instructing device for giving the player a visual instruction to operate the operation members in accordance with progress of a play of the musical composition based on the data stored in the storage device and an effect producing device for producing a performance effect in response to a performance operation performed by the player to each of the operation members (collectively, the "Scope of the '244").

51. Despite the fact that the claims of the '244 patent cover only the Scope of the '244, Defendant marked (or caused to be marked) the following products that are clearly out of the scope of the '244 patent: (i) Guitar Hero 5 (for all video game consoles); (ii) Band Hero (for all video game consoles); and (iii) Guitar Hero Smash Hits (for all consoles) (the "Out of Scope '244 Products"). (*See* Ex. L through S.) While the actual scope of the '244 patent is governed (and the Scope of the '244 is further narrowed) by the complete set of claim limitations, the limitations that are listed as the Scope of the '244 patent demonstrate that the Out of Scope '244 Products clearly do not practice the '244 patent.

52. Defendant knew that the '244 patent does not cover the Out of Scope '244 Products.

53. Alternatively, because the '244 patent unmistakably does not cover the Out of Scope '244 Products, Defendant cannot have any reasonable belief that the Out of Scope '244 Products are patented or covered by the '244 patent.

54. Defendant intended to deceive the public by marking (or causing to be marked) the Out of Scope '244 Products with the '244 patent.

55. United States Patent No. 6,429,863 (the "'863 patent"), titled *Method and Apparatus for Displaying Musical Data in a Three Dimensional Environment*, was issued by the United States Patent and Trademark Office on August 6, 2002. (*See* Ex. G.) The '863 patent only covers or protects, by way of patent property right, (i) an apparatus for displaying musical data comprising, *inter alia*, a graphics engine, in communication with said memory element, rendering the musical data such that a spatial path corresponding to a musical time axis associated with the musical data does not lie in an image plane of a display and (ii) certain methods (collectively, the "Scope of the '863").

56. Despite the fact that the claims of the '863 patent cover only the Scope of the '863, Defendant marked (or caused to be marked) the following products that are clearly out of the scope of the '863 patent: (i) DJ Hero (for all video game consoles); (ii) Guitar Hero 5 (for all video game consoles); (iii) Band Hero (for all video game consoles); and (iv) Guitar Hero (for all consoles) (the "Out of Scope '863 Products"). (*See* Ex. L through R; *see also* Ex. T.) While the actual scope of the '863 patent is governed (and the Scope of the '863 is further narrowed) by the complete set of claim limitations, the limitations that are listed as the Scope of the '863 patent demonstrate that the Out of Scope '863 Products clearly do not practice the '863 patent.

57. Defendant knew that the '863 patent does not cover the Out of Scope '863 Products.

58.   Alternatively, because the '863 patent unmistakably does not cover the Out of Scope '863 Products, Defendant cannot have any reasonable belief that the Out of Scope '863 Products are patented or covered by the '863 patent.

59.   Defendant intended to deceive the public by marking (or causing to be marked) the Out of Scope '863 Products with the '863 patent.

60.   United States Patent No. 6,758,753 (the "'753 patent"), titled *Input Apparatus for Game Systems*, was issued by the United States Patent and Trademark Office on July 6, 2004. (*See* Ex. H.) The '753 patent only covers or protects, by way of patent property right, (i) an input apparatus for game systems comprising, *inter alia*, an operation member adapted to receive a load and a plurality of detection units arranged such that said operation member is supported by said detection units at a plurality of points around an outer circumference of said operation member with a space being formed under a center of said operation member; (ii) an input apparatus for game systems comprising, *inter alia*, a base having a plurality of panel-attaching sections and an operation member arranged at each of said panel-attaching sections and adapted to receive a load and a plurality of detection units arranged at each of said panel-attaching sections such that said operation member is supported by said detection units at a plurality of points around an outer circumference of said operation member with a space being formed under a center of said operation member; (iii) a foot switch for an input apparatus for game systems comprising, *inter alia*, a frame defining a support surface and at least one detection unit arranged on said support surface of said frame and to output a detection signal in response to changes in a load applied in a predetermined direction, each of said at least one detection unit comprising a sensing element and a coating member made of elastic and surrounding said sensing element, said sensing element including a pair of elongate electrode plates arranged to contact or separate

from each other according to the load, and said coating member including a protrusion for limiting a position to which the load toward said sensing element is transmitted, said protrusion being spaced from both longitudinal ends of said electrode plates and an operation member adapted to receive a load and arranged in contact with said coating member of said at least one detection unit such that said coating member supports said operation member on said fame and transmits the load received by said operation member to said sensing element; (iv) an input apparatus for game systems comprising, *inter alia*, an operation member adapted to receive a load and having an outer surface portion formed into a panel and a detection unit capable of outputting predetermined detection signal in response to changes in load in a predetermined direction in relation to said operation member (collectively, the "Scope of the '753").

61. Despite the fact that the claims of the '753 patent cover only the Scope of the '753, Defendant marked (or caused to be marked) the following products that are clearly out of the scope of the '753 patent: (i) Guitar Hero 5 (for all video game consoles); (ii) Band Hero (for all video game consoles); and (iii) Guitar Hero Smash Hits (for all consoles) (the "Out of Scope '753 Products"). (*See* Ex. L through S.) While the actual scope of the '753 patent is governed (and the Scope of the '753 is further narrowed) by the complete set of claim limitations, the limitations that are listed as the Scope of the '753 patent demonstrate that the Out of Scope '753 Products clearly do not practice the '753 patent.

62. Defendant knew that the '753 patent does not cover the Out of Scope '753 Products.

63. Alternatively, because the '753 patent unmistakably does not cover the Out of Scope '753 Products, Defendant cannot have any reasonable belief that the Out of Scope '753 Products are patented or covered by the '753 patent.

64. Defendant intended to deceive the public by marking (or causing to be marked) the Out of Scope '753 Products with the '753 patent.

65. United States Patent No. 6,769,689 (the "'689 patent"), titled *Turn-Table Adapter Capable of Being Attached to a Game Device and Portable Game Device Using the Same*, was issued by the United States Patent and Trademark Office on August 3, 2004. (*See* Ex. I.) The '689 patent only covers or protects, by way of patent property right, (i) a turn-table adapter capable of being attached to a game device provided with a press-switch serving as an operation member of an input device, said turn-table adapter comprising, *inter alia*, a clip to be detachably mounted on a case of the game device and an operation disk attached to one arm of the clip and rotatably operable by a player; (ii) a turn-table adapter capable of being attached to a game device provided with a press-switch serving as an operation member of an input device, said turn-table adapter comprising, *inter alia*, a clip to be detachably mounted on a case of the game device and an operation disk attached to one arm of the clip and rotatably operable by a player; (iii) a turn-table adapter capable of being attached to a game device provided with a press-switch serving as an operation member of an input device, said turn-table adapter comprising, *inter alia*, a clip mountable on a case of the game device and a shaft passing through one arm of the clip and an operation disk coaxially provided to the shaft at one end thereof and a press-in disk coaxially provided to the shaft at another end thereof; (iv) a turn-table adapter capable of being attached to a game device provided with a press-switch serving as an operation member of an input device, said turn-table adapter comprising, *inter alia*, a clip mountable on a case of the game device and a shaft attached to one arm of the clip and an operation disk provided to the shaft at one end thereof; (v) a turn-table adapter for mounting on a game device having a press-switch on a first side and an opposing second side, said turn-table adapter comprising, *inter alia*,

a clip having a first arm engaging said first side and a second arm engaging said second side and a shaft rotatably mounted in said first arm and having a first end and a second end and a rotatable input member mounted on a first end of said shaft for operation by a player and an actuation member mounted on said second end of said shaft to rotate with said rotatable input member; (vi) a turn-table adapter for mounting on a game device having a press-switch on a first side and an opposing second side, said turn-table adapter comprising, *inter alia*, a clip having a first arm engaging said first side and a second arm engaging said second side and a shaft rotatably mounted in said first arm and having a first end and a second end and a rotatable input member mounted on a first end of said shaft for operation by a player and a press-switch engaging member movably mounted on said first arm and disposed such that said cam structure engages said press-switch engaging member to move the press-switch engaging member into actuating contact with said press-switch in response to rotation of said rotatable input member (collectively, the "Scope of '689").

66. Despite the fact that the claims of the '689 patent cover only the Scope of the '689, Defendant marked (or caused to be marked) the following products that are clearly out of the scope of the '689 patent: (i) Guitar Hero 5 (for all video game consoles); (ii) Band Hero (for all video game consoles); and (iii) Guitar Hero Smash Hits (for all consoles) (the "Out of Scope '689 Products"). (*See* Ex. L through S.) While the actual scope of the '689 patent is governed (and the Scope of the '689 is further narrowed) by the complete set of claim limitations, the limitations that are listed as the Scope of the '689 patent demonstrate that the Out of Scope '689 Products clearly do not practice the '689 patent.

67. Defendant knew that the '689 patent does not cover the Out of Scope '689 Products.

68. Alternatively, because the '689 patent unmistakably does not cover the Out of Scope '689 Products, Defendant cannot have any reasonable belief that the Out of Scope '689 Products are patented or covered by the '689 patent.

69. Defendant intended to deceive the public by marking (or causing to be marked) the Out of Scope '689 Products with the '689 patent.

70. United States Patent No. D441,403 (the "'403 patent"), titled Operating Apparatus for Game Machine, was issued by the United States Patent and Trademark Office on May 1, 2001. (*See* Ex. J.) The '403 patent only covers or protects, by way of patent property right, an ornamental design for an operating apparatus for a game machine as depicted in the figures of the '403 patent (the "Scope of the '403 patent").

71. Despite the fact that the claims of the '403 patent cover only the Scope of the '403 patent, Defendant marked (or caused to be marked) the following products that are clearly out of the scope of the '403 patent: (i) Guitar Hero 5 (for all video game consoles); and (ii) Guitar Hero Smash Hits (for all consoles) (the "Out of Scope '403 Products"). (*See* Ex. L through O; *see also* Ex. S.) The figures of the '403 patent, which define the Scope of the '403, patent demonstrate that the Out of Scope '403 Products clearly do not practice the '403 patent.

72. Defendant knew that the '403 patent does not cover the Out of Scope '403 Products.

73. Alternatively, because the '403 patent unmistakably does not cover the Out of Scope '403 Products, Defendant cannot have any reasonable belief that the Out of Scope '403 Products are patented or covered by the '403 patent.

74. Defendant intended to deceive the public by marking (or causing to be marked) the Out of Scope '403 Products with the '403 patent.